USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT  ____________________ No. 95-1910 UNITED STATES OF AMERICA, Appellee, v. JUAN ZAYAS-DIAZ, Defendant, Appellant.  ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE  [Hon. Paul J. Barbadoro, U.S. District Judge] ___________________  ____________________ Before Selya, Cyr and Boudin, Circuit Judges. ______________  ____________________ Paul J. Garrity for appellant. _______________ Terry L. Ollila, Assistant United States Attorney, with whom Paul _______________ ____ M. Gagnon, United States Attorney, was on brief for appellee. _________  ____________________ September 9, 1996  ____________________ CYR, Circuit Judge. Juan Zayas-Diaz ("Zayas") chal- CYR, Circuit Judge. ______________ lenges two pivotal rulings underlying the district court's refusal to suppress evidence seized pursuant to a warrant alleg- edly based on information that failed to connect Zayas to the search premises within a reasonably recent time frame. The court first determined, on the merits, that the affidavit supporting the warrant application contained adequate reliable information to connect Zayas to the search premises in the past. Next, the court bypassed the merits of the staleness claim and held the exclusionary rule inapplicable on the ground that the search had been conducted in "objectively reasonable" reliance on the warrant. See United States v. Leon, 468 U.S. 897 (1984). ___ _____________ ____ Finding no error, we now affirm the district court judgment.  I I BACKGROUND BACKGROUND __________ A. The Graffam Affidavit A. The Graffam Affidavit _____________________ On March 8, 1994, a warrant was obtained to search a single-family residence in Bedford, New Hampshire, based on a nineteen-page affidavit by Special Agent Gerald Graffam of the United States Drug Enforcement Administration ("DEA"), purporting to establish probable cause to believe that Zayas then or recent- ly resided at 16 Holbrook Road and used it as an operational base for cocaine trafficking.1 The warrant application sought autho- rization to search for various drug-related documents and curren-  ____________________ 1The criminal investigation was conducted by federal, state, and local law enforcement authorities, to whom we refer collec- tively as "the authorities."  2 cy evidencing the suspected cocaine trafficking activity.  1. The Cocaine Trafficking  1. The Cocaine Trafficking _______________________ The Graffam affidavit included information purporting to establish that Zayas was supplying cocaine for distribution at various establishments in nearby Manchester, New Hampshire, including the Oasis Social Club. Based on information provided by a "reliable" confidential informant ("first CI"), the affida- vit related that Marcello Sosa had been arrested on January 26, 1994, for selling cocaine at the Oasis Social Club.2 An arrest- ing officer advised that he had noticed an individual, known to him as "Juan Rosario" alias "Nelson Martell," at the Oasis Social Club during Sosa's arrest. The first CI confirmed that he too had seen Sosa and a person known to him as "Juan" meet at the club, not only at the time of Sosa's arrest but on prior occa- sions. Sosa himself admitted that a man named "Juan," who was present when Sosa was arrested, had supplied the six ounces of cocaine seized from Sosa's residence shortly after the arrest.  A subsequent documentation and record check disclosed a series of roughly compatible descriptions for "Nelson Martell" (height 5'6-9"; weight 130-160 pounds; hair black or brown; eyes brown; glasses; left-arm tatoo; social security number 001-64- 1999; birth date either May 4, 1961 or August 16, 1954); home address 275 Lake Avenue, Manchester; license suspension for drunk driving in 1991; New Hampshire conviction and suspended sentence  ____________________ 2For ease in reference, we assume all confidential infor- mants were male.  3 for heroin trafficking in 1992; and a December 1992 arrest and pending prosecution for cocaine trafficking in Connecticut, during which arrest Zayas attempted to discard cocaine over a highway embankment; and other aliases, including "Juan Gonzalez." On February 24, 1994, twelve days before the search, the Manchester police interviewed a confidential informant ("second CI"). The second CI, who had "provided reliable infor- mation to law enforcement in the past," advised that he knew a person named "Juan," surname believed to be "Esquevar," who "currently controls" cocaine distribution at various Manchester business establishments, including the Oasis Social Club, and who delivered cocaine daily to his "workers," including Sosa. The second CI described "Juan" (Cuban, dark-skinned, height 5'10", weight 160 pounds, black hair, brown eyes, glasses), and told the authorities that he was "aware" that "Juan" had been arrested in Connecticut on a cocaine trafficking charge, and that "Juan" had attempted to discard two kilos of cocaine at the time of the arrest by throwing it over a highway embankment.  2. Zayas and 16 Holbrook Road 2. Zayas and 16 Holbrook Road __________________________ Although the documentation check revealed a listed home address for "Nelson Martell" (i.e., Zayas) at 275 Lake Avenue in Manchester, the Graffam affidavit attested to facts purporting to show that Zayas currently or recently resided at 16 Holbrook Road in Bedford, New Hampshire. Following his arrest, Sosa told police that "Juan," his supplier, "lived" in Bedford, New Hamp- 4 shire. Moreover, on February 24, 1994, the second CI also had advised the authorities that Juan "lives" in Bedford and "deals" large amounts of cocaine. The second CI added that he had "been to Juan's Bedford residence on several occasions and seen large quantities of cocaine and cash present," and that "[S]panish males," in two or more automobiles bearing New York license plates, arrived "every Tuesday" at the Bedford residence.  On February 24, 1994, after his interview, the second CI led the authorities to the Bedford premises at which he had visited "Juan." Presumably to avoid detection, the authorities did not enter upon the premises. Instead, the second CI de- scribed specific features of the residential grounds, including (1) a long driveway lined with three birdhouses containing concealed video cameras; (2) a shack-like residence with peeling brown paint; (3) five dogs outside the house, and an unspecified number of dog houses; and (4) four or five abandoned/junk vehi- cles, including a motorcycle. The second CI described interior features of the residence itself, including (1) a video monitor connected to the "birdhouse" cameras; (2) furnishings, "in good condition" compared with the shabby exterior of the residence; and (3) in the basement, a restaurant-style refrigerator for storing cocaine. Subsequent aerial surveillance at 16 Holbrook Road revealed a long driveway, a brown single-family dwelling with detached garage and shed, and "at least three (3) doghouses and two (2) abandoned vehicles." 3. The "Residence" at 16 Holbrook Road 3. The "Residence" at 16 Holbrook Road ___________________________________ and the Zayas-Koehler "Relationship" and the Zayas-Koehler "Relationship" ___________________________________ 5 The Graffam affidavit purported to establish 16  Holbrook Road as Zayas' current or recent residence or drug operation base, by demonstrating that codefendant Brenda Koehler currently or recently lived there, and that she and Zayas were currently involved in a close relationship. The second CI advised the authorities that "Juan" lived at 16 Holbrook Road "with a girlfriend," described as a "white female," about thirty years old, with brown hair, whose son also resided at 16 Holbrook Road and "attends" Trinity High School, where he "plays foot- ball." An October 1992 police incident report confirmed that a "Kevin Koehler" had sustained an injury while playing football at Trinity High School, identified his mother as Brenda Koehler, "16 Holbrook Road," telephone number 624-8730. A postal delivery check indicated that Kevin Koehler had received mail at 16 Holbrook Road in 1992. A June 1993 traffic accident report reflected 16 Holbrook Road as Brenda Koehler's home address. A third confidential informant ("third CI") confirmed that "Juan," who supplied cocaine to workers at the Oasis Social Club, "had a white wife . . . in her thirties."  On February 10, 1994, James McDowell advised the authorities that he had leased a garage at 425 Second Street, Manchester, to Brenda Koehler, who was accompanied by a "Nelson Martell" at the time she signed the lease. The Graffam affidavit failed to disclose the date the lease was signed. McDowell told the authorities that he "believed Brenda Koehler was Martell's wife," and advised that Koehler gave "16 Holbrook Road" as her 6 home address, and 624-8730 as her telephone number. Thereafter, in late February 1994, a motor vehicle registration check dis- closed a roughly compatible physical description for Brenda Koehler ("white female," thirty-four years old, height 5' 2", brown hair, brown eyes), and listed her address as 481 Beacon Street, Manchester.  4. Activity at 16 Holbrook Road 4. Activity at 16 Holbrook Road ____________________________ In late February 1994, the authorities learned that mail was not "presently" being received at 16 Holbrook Road. Moreover, by this time there was no longer a telephone listing for 16 Holbrook Road. The electrical utility listing nonetheless continued to reflect that Brenda Koehler was the person responsi- ble for payment. Moreover, though the premises were heated by oil, the electrical utility reported the following billings: October-November 1993 ($565 for 4595 kw hours), November-December 1993 ($462 for 3679 kw hours), and December 1993-January 1994 ($600.00 for 5024 kw hours).  5. Graffam's Law Enforcement Experience 5. Graffam's Law Enforcement Experience ____________________________________ Finally, based on Graffam's twenty-two years as a DEA agent, the supporting affidavit stated that active drug traffick- ers commonly: (1) retain for ready reference, in their residenc- es for extended periods, records relating to their ongoing trafficking activities; (2) assume fictitious names or use nominees to avoid detection; (3) establish surveillance at their operational bases to detect law enforcement activity; and (4) attempt to avoid disclosure or discovery of their actual resi- 7 dences and operational bases by suspending mail and telephone service. B. The District Court Proceedings B. The District Court Proceedings ______________________________ The search conducted pursuant to the challenged warrant disclosed ammunition, cocaine residue, cocaine distributing paraphernalia, substantial cash, and numerous documents detailing Zayas' ongoing cocaine trafficking activities. In due course, Zayas and ten associates, including Brenda Koehler, were charged with conspiracy to possess cocaine with intent to distribute.3 See 21 U.S.C. 841(a)(1), 846. Zayas and Koehler jointly ___ sought to suppress the evidence seized at 16 Holbrook Road, claiming among other things that the Graffam affidavit did not reflect "16 Holbrook Road" as the address at which "Juan" resided or conducted drug operations and that much crucial information in the affidavit was irredeemably "stale." Zayas stressed in particular that the Graffam affidavit, which identified February 24, 1994, as the date upon which the authorities interviewed the second CI, nonetheless failed to state when the second CI last visited with "Juan" at 16 Holbrook Road. The district court denied the motion to suppress after an evidentiary hearing. United States v. Zayas-Diaz, No. 94-30- _____________ __________  ____________________ 3The nine other defendants entered guilty pleas. The government does not now contend that Zayas lacked an objectively reasonable expectation of privacy in the 16 Holbrook Road premis- es at the time the search was conducted. See, e.g., United ___ ____ ______ States v. Bouffard, 917 F.2d 673, 675-76 (1st Cir. 1990); United ______ ________ ______ States v. Soule, 908 F.2d 1032, 1034 (1st Cir. 1990).  ______ _____ 8 01-B (D.N.H. Dec. 22, 1994).4 First, it ruled that the Graffam affidavit contained sufficient information to provide probable cause to believe that Zayas either resided or conducted drug operations at 16 Holbrook Road. Second, without deciding whether the matters affirmed in the Graffam affidavit were sufficiently contemporaneous to afford a substantial basis for the probable cause determination, the district court held the exclusionary rule inapplicable based on the so-called "good faith" exception. See Leon, 468 U.S. at 923 (holding that the exclusionary rule is ___ ____ not implicated unless, inter alia, the supporting affidavit was _____ ____ "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"). II II DISCUSSION DISCUSSION __________ On appeal, Zayas resurfaces two claims previously presented to the district court: (1) the Graffam affidavit contained insufficient information to provide a substantial basis for finding it probable that evidence relating to Zayas' drug trafficking activities would be found at 16 Holbrook Road; and (2) the Leon "good faith" exception to the exclusionary rule is ____ unavailing because any reasonably well-trained law enforcement officer would know that the "stale" information in the Graffam affidavit was not adequate to establish probable cause to believe that 16 Holbrook Road was either Zayas' recent or current resi-  ____________________ 4Following a five-day jury trial, Zayas was found guilty on the conspiracy charge. The district court later sentenced him to 360 months. 9 dence or drug operation site; and the more current information neither cured the staleness nor provided an independent basis for a "probable cause" determination.  A. The "Probable Cause" Connection A. The "Probable Cause" Connection _______________________________ Between Zayas and 16 Holbrook Road  Between Zayas and 16 Holbrook Road  __________________________________ The district court held that the Graffam affidavit afforded probable cause to believe that Zayas resided or conduct- ed drug operations at 16 Holbrook Road in the past. It found the second CI's identification of 16 Holbrook Road to be reliable because the authorities were "able to corroborate so much of [his] statement both as to innocent details and as to incrimi- nating matters, such as Zayas-Diaz's involvement in the cocaine transaction." See Tr. of Suppression Hearing at 107-08 (citing ___ United States v. Taylor, 985 F.2d 3, 6 (1st Cir.), cert. denied, _____________ ______ _____ ______ 508 U.S. 944 (1993)).  1. The "Probable Cause" Standard 1. The "Probable Cause" Standard _____________________________ For evidence to avert suppression, see generally Mapp ___ _________ ____ v. Ohio, 367 U.S. 643 (1961), normally the warrant application ____ must demonstrate probable cause to believe that a particular person has committed a crime "the commission element" and ___ that enumerated evidence relevant to the probable criminality likely is located at the place to be searched "the `nexus' element". United States v. Fuccillo, 808 F.2d 173, 175 (1st ______________ ________ Cir.), cert. denied, 482 U.S. 905 (1987). The issuing magistrate _____ ______ ordinarily considers only the facts set forth in supporting affidavits accompanying the warrant application. See, e.g., ___ ____ Whiteley v. Warden, Wyo. State Penitentiary, 401 U.S. 560, 565 ________ ________________________________ 10 (1971); Aguilar v. Texas, 378 U.S. 108, 109 (1964); United States _______ _____ _____________ v. Klein, 565 F.2d 183, 186 n.4 (1st Cir. 1977). Under the _____ "probable cause" standard, the "totality of the circumstances" disclosed in the supporting affidavits must demonstrate "a fair ____ probability that contraband or evidence of a crime will be found ___________ in a particular place." Illinois v. Gates, 462 U.S. 213, 238 ________ _____ (1983) (emphasis added); United States v. Bucuvalas, 970 F.2d _____________ _________ 937, 940 (1st Cir. 1992), cert. denied, 507 U.S. 959 (1993).  _____ ______ Among others, the factors that may contribute to a "probable cause" determination include whether an affidavit supports the probable "`veracity' or `basis of knowledge' of persons supplying hearsay information," id.; whether informant ___ statements are self-authenticating, see, e.g., Taylor, 985 F.2d ___ ____ ______ at 5 (noting that affidavit may support informant's veracity "through the very specificity and detail with which it relates the informant's first-hand description of the place to be searched"); whether some or all the informant's factual state- ments were corroborated wherever reasonable and practicable (e.g., through police surveillance);5 and whether a law-enforce- ment affiant included a professional assessment of the probable significance of the facts related by the informant, based on  ____________________ 5See Gates, 462 U.S. at 244; Soule, 908 F.2d at 1039 (noting ___ _____ _____ that police contemporaneously corroborated "the material elements of the [informant's] tip"); see also Alabama v. White, 496 U.S. ___ ____ _______ _____ 325, 331 (1990) ("[Because an informant is right about some things, he is more probably right about others."); Draper v. ______ United States, 358 U.S. 307, 313 (1959); United States v. Lalor, _____________ _____________ _____ 996 F.2d 1578, 1581 (4th Cir.), cert. denied, 510 U.S. 983 _____ ______ (1993). 11 experience or expertise, see United States v. Hoffman, 832 F.2d, ___ _____________ _______ 1299, 1306 (1st Cir. 1987) (noting that law-enforcement affiants were "specially trained in the ways of drug trafficking"). None of these factors is indispensable; thus, stronger evidence on one or more factors may compensate for a weaker or deficient showing on another. See Taylor, 985 F.2d at 5; United States v. Nocella, ___ ______ _____________ _______ 849 F.2d 33, 37 (1st Cir. 1988); United States v. Ciampa, 793 _____________ ______ F.2d 19, 22 (1986). Reviewing courts, including both the district court and the court of appeals, must accord "consid- erable deference" to the "probable cause" determination made by the issuing magistrate. See Taylor, 985 F.2d at 5 ("[T]he duty ___ ______ of the reviewing court is simply to ensure that the magistrate had a `substantial basis for . . . conclud[ing]' that probable cause existed."). The reviewing court must examine "the affida- vit in `a practical, "common sense" fashion, and [ ] accord considerable deference to reasonable inferences the [issuing magistrate] may have drawn from the attested facts.'" Bucuvalas, _________ 970 F.2d at 940 (citations omitted). Moreover, given the strong preference for warrants under our Fourth Amendment jurisprudence, normally a reviewing court will defer to an issuing magistrate's "probable cause" determination in a doubtful or marginal case. See United States v. Ventresca, 380 U.S. 102, 109 (1965); United ___ _____________ _________ ______ States v. Craig, 861 F.2d 818, 823 (5th Cir. 1988).  ______ _____ 2. The Connection Between Zayas and 16 Holbrook Road6 2. The Connection Between Zayas and 16 Holbrook Road _________________________________________________  ____________________ 6We review the district court's factual findings (if any) only for clear error, but we review de novo its ultimate determi- __ ____ nation that a given set of facts constituted "probable cause." 12 Zayas argues that the Graffam affidavit is insufficient because (i) it did not explicitly identify 16 Holbrook Road as __________ the address at which the second CI visited Zayas on several prior occasions and saw large amounts of cocaine and cash, and (ii) the description of the premises given by the second CI differed in some respects from the information disclosed in the subsequent aerial surveillance. See supra Section I.A.2. We note at the ___ _____ outset that this argument ignores the incriminating network of _____________ _______ __ circumstantial evidence pointing unmistakably to 16 Holbrook Road ______________ ________ as the Bedford residence at which the second CI had visited Zayas in the past, see supra Section I.A. Moreover, its implicit ___ _____ presumption that the second CI probably led the authorities to premises other than those at which he had visited Zayas is untenable given Graffam's attestation that the second CI had demonstrated his reliability in the past. See United States v. ___ ______________ Schaefer, 87 F.3d 562, 566 1st Cir. 1996).7 Finally, the argu- ________  ____________________ See United States v. Schaefer, 87 F.3d 562, 565 n.2 (1st Cir. ___ _____________ ________ 1996) (citing Ornelas v. United States, 116 S. Ct. 1657 (1996)). _______ _____________ 7In addition, the second CI related prior criminal activity by Zayas (e.g., dumping cocaine over an embankment in 1992 at the time he was arrested in Connecticut) and descriptions of exterior and interior features at 16 Holbrook Road. See Taylor, 985 F.2d ___ ______ at 6 (noting that a CI's overall reliability may be demonstrated by the "very specificity and detail" of descriptions of search premises, or of defendant's prior criminal activity or record). Moreover, the authorities here independently corroborated many of these details through a documentation and record check and aerial surveillance. See Soule, 908 F.2d at 1039 (noting that police ___ _____ contemporaneously corroborated "the material elements of the [informant's] tip"). Further, some of the second CI's statements were confirmed by the third CI (e.g., the description of Zayas' wife/girlfriend as a white, thirty-year-old female a descrip- tion likewise corroborated by a documentation check on Koehler). See Schaefer, 87 F.3d at 566 (holding that consistencies between ___ ________ 13 ment aimed at undermining the corroborative information gathered through aerial surveillance of 16 Holbrook Road likewise fails, since it too presumes that the second CI either did not know the ____ location of the premises at which he had visited Zayas on several prior occasions or that he misrepresented its physical charac- teristics. See id. at 567 ("When an informant's statements and ___ ___ the events he describes diverge in minor ways, the magistrate may reasonably choose to credit the statements and disregard petty inconsistencies.").  Our de novo assessment of the totality of the circum- __ ____ stances conveyed in the Graffam affidavit persuades us that the issuing magistrate had a substantial basis for crediting the second CI's overall reliability, and by extension his identifica- tion of 16 Holbrook Road as the locus of his prior visits. The demonstrated reliability of the second CI, together with the substantial similarity in the physical characteristics of the premises, as described by the second CI and buttressed by the aerial surveillance of 16 Holbrook Road, provided adequate support for the issuing magistrate's practical, common-sense "probable cause" determination that the Zayas residence/drug operation base previously visited by the second CI was located at 16 Holbrook Road in Bedford, New Hampshire. See Gates, 462 U.S. ___ _____ at 238. B. The Staleness Claim  B. The Staleness Claim  ___________________  ____________________ informants' reports may serve to validate both accounts). ____ "[Because an informant is right about some things, he is more probably right about others." Alabama, 496 U.S. at 331. _______ 14 1. Leon Bypass 1. Leon Bypass ___________ The district court elected to bypass the merits of the staleness claim that the Graffam affidavit afforded no substan- tial basis for a "probable cause" finding that Zayas either resided or conducted drug operations within a reasonably recent time frame at 16 Holbrook Road. See Zayas-Diaz, No. 94-30-01-B, ___ __________ slip op. at 7. Leon allows the trial court, in its "informed ____ discretion," to bypass the customary "merits" inquiry into whether there existed a "substantial basis" for the probable cause determination made by the issuing magistrate, and simply decide instead whether the challenged search in all events came within the "good faith" exception to the exclusionary rule. Leon, 468 U.S. at 925; see Gates, 462 U.S. at 264-65 (White, J., ____ ___ _____ concurring); see, e.g., United States v. Manning, 79 F.3d 212, ___ ____ ______________ _______ 221 (1st Cir. 1996), petition for cert. filed, ___ U.S.L.W. ___ ________ ___ _____ _____ (U.S. June 19, 1996) (No. 95-9375); Craig, 861 F.2d at 820 _____ (discussing principles of "judicial restraint" and "precedent" affecting Leon bypass determinations).8  ____  ____________________ 8Leon identifies important prudential considerations that ____ inform the discretionary bypass decision at the suppression stage.  If the resolution of a particular Fourth Amendment question is necessary to guide future action by law enforcement officers and magistrates, nothing will prevent reviewing courts from deciding that question before turning to the good-faith issue. Indeed, it frequently will be difficult to determine whether the officers acted reasonably without resolving the Fourth Amendment issue. Even if the Fourth Amendment question is not one of broad import, reviewing courts could de- 15 2. The Leon Exception 2. The Leon Exception __________________ The instant Leon "good faith" analysis fundamentally ____ depends upon the "probable cause" concept itself. See supra ___ _____ Section II.A.1. The "commission" and "nexus" elements in the "probable cause" analysis each include a temporal component. The issuing magistrate must not only consider the accuracy and reliability of the historical facts related in the affidavits, but must determine, inter alia, whether the totality of the _____ ____ circumstances reasonably inferable from the affidavits demon- strates a "fair probability" that evidence material to the "commission" of the probable crime will be disclosed at the search premises at about the time the search warrant would issue, rather than at some remote time. See Sgro v. United States, 287 ___ ____ _____________ U.S. 206, 210 (1932); United States v. Wilkinson, 926 F.2d 22, 27 _____________ _________ (1st Cir.), cert. denied, 501 U.S. 1211 (1991).  _____ ______ As the more serious challenge to the Graffam affidavit focuses on its allegedly "stale" information, thus arguably describing events that occurred at some remote earlier time, see ___  ____________________ cide in particular cases that magistrates under their supervision need to be informed of their errors and so evaluate the officers' good faith only after finding a violation. In other circumstances, those courts could reject suppression motions posing no impor- tant Fourth Amendment questions by turning immediately to a consideration of the officers' good faith. We have no reason to believe that our Fourth Amendment jurispru- dence would suffer . . . . Leon, 468 U.S. at 925. As neither party challenges the bypass ____ decision itself, we turn directly to the Leon exception.  ____ 16 Bucuvalas, 970 F.2d at 940, we devote particular attention to the _________ contemporaneity of the attested facts relating to Zayas' connec- tion with 16 Holbrook Road at or about the time the search warrant issued on March 4, 1994. As already noted, however, ultimately the "probable cause" analysis takes into account the totality of the circumstances reasonably inferable from the reliable facts set forth in the Graffam affidavit. Thus, a weak showing on a particular factor may be offset by more compelling evidence on another relevant factor in the "probable cause" analysis. See supra Section II.A.1.  ___ _____ Once the trial court elects to bypass the merits and proceed with the Leon analysis, moreover, the "probable cause" ____ focus shifts. Since no deterrent purpose is served by sanction- ing "objectively reasonable" law enforcement conduct, see United ___ ______ States v. Ricciardelli, 998 F.2d 8, 15 (1st Cir. 1993) (citation ______ ____________ omitted), the "extreme sanction" of exclusion is inapplicable to evidence seized pursuant to a search warrant obtained in an "objectively reasonable" manner from a neutral magistrate, even assuming the warrant or supporting affidavits were defective, see ___ Leon, 468 U.S. at 921, 926.  ____ The Supreme Court employed four exemplars in Leon to ____ outline the ongoing role it envisioned for "exclusionary rule" deterrence in circumstances where evidence is seized pursuant to a search warrant: (1) the magistrate is "misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth"; 17 (2) the magistrate "wholly abandon[s] his [detached and neutral] judicial role"; (3) the warrant is "so facially deficient [e.g., failing to list, with sufficient particularity, the evidence to be seized] . . . that the executing officers cannot reasonably presume it to be valid"; or (4) the supporting affidavits are "`so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" Id. at 923 ___ (citing Brown v. Illinois, 422 U.S. 590, 610-11 (1975) (Powell, _____ ________ J., concurring in part)). The instant Leon dispute implicates ____ only the latter category.9  With respect to the critical temporal "nexus," Zayas contends that the Graffam affidavit contained only "stale" information that he resided or conducted drug operations at 16 Holbrook Road, since the second CI did not specify when he last visited Zayas there. Absent other reliable evidence of a dis- cernible temporal nexus, says Zayas, it was "entirely unreason- able" for the executing officers to rely on the Graffam affidavit as an adequate basis for the required "probable cause" showing. See id. This challenge likewise impermissibly depends, in part, ___ ___  ____________________ 9Zayas does not claim, for example, that the second CI told the authorities the date he last visited Zayas at 16 Holbrook Road, nor that such information was deliberately or recklessly omitted from the Graffam affidavit. See, e.g., Craig, 861 F.2d ___ ____ _____ at 822 (noting that defendant did not contend that the Leon "good ____ faith" exception was unavailable because the affiant omitted information from the affidavit to deceive the issuing judicial officer). Of course, had Zayas meant to impugn police motives, the appropriate course would have been to request an evidentiary hearing under Franks. See Franks v. Delaware, 438 U.S. 154 ______ ___ ______ ________ (1978); United States v. Williams, 897 F.2d 1034, 1038 (10th ______________ ________ Cir. 1990), cert. denied, 500 U.S. 937 (1991).  _____ ______ 18 upon the implicit assumption that the second CI misdescribed exterior features of the premises, but see supra Section II.A, ___ ___ _____ despite the substantially contemporaneous aerial surveillance _____________ _______________ which essentially corroborated the description given by the second CI, and notwithstanding Graffam's vouching for the second CI's reliability.  The lone respect in which this aspect of Zayas' Leon ____ challenge differs from that discussed above, see supra Section ___ _____ II.A, is its focus on Graffam's undeniable failure to ascribe in the affidavit an approximate date to the second CI's last visit with Zayas at 16 Holbrook Road. At this juncture it is important to note that the government must establish "objectively reason- able" reliance on a defective warrant, see, e.g., Leon, 468 U.S. ___ ____ ____ at 924, based on all the circumstances, id. at 923; Ricciardelli, ___ ____________ 998 F.2d at 15. Moreover, though the "clear error" standard governs our review of any findings of fact, see, e.g., United ___ ____ ______ States v. Jackson, 67 F.3d 1359, 1366 (8th Cir. 1995), cert. ______ _______ _____ denied, 116 S. Ct. 1684 (1996), the ultimate determination as to ______ whether the executing officers acted in objectively reasonable reliance on a defective warrant is reviewed de novo. United __ ____ ______ States v. Procopio, 88 F.3d 21, 28 (1st Cir. 1996).10  ______ ________  ____________________ 10In our own case, the district court relied on the follow- ing four grounds. First, in describing his "several" visits to 16 Holbrook Road, the second CI stated that Juan "lives," and "deals" drugs, in Bedford. Zayas-Diaz, No. 94-30-01-B, slip op. __________ at 8. Next, the follow-up aerial surveillance of 16 Holbrook Road "substantially" corroborated the second CI's description of the residential grounds at 16 Holbrook Road. Id. Third, ___ Marcello Sosa admitted that his cocaine supplier, "Juan," "lived" in Bedford. Id. at 8-9. Finally, the statements James McDowell ___ 19 Were the critical time element presently under discus- sion otherwise indiscernible within the four corners of the Graffam affidavit, see Bucuvalas, 970 F.2d at 940, the government ___ _________ might well have been unable to save the evidence seized at 16 Holbrook Road. See, e.g., United States v. Huggins, 733 F. Supp. ___ ____ _____________ _______ 445, 449 (D.D.C. 1990) (Leon doctrine unavailing where court ____ could not infer, from information within "the four corners of the affidavit . . . the time during which the criminal activity was observed") (citing Herrington v. State, 697 S.W.2d 899, 900-01 __________ _____ (Ark. 1985)). Ostensibly, the second CI's statement that he had visited with Zayas at 16 Holbrook Road on several occasions is a prime example of "undated stale" information, which raises the specter that "officers with information of questionable recency [may] escape embarrassment by simply omitting averments as to time." Rosencranz v. United States, 356 F.2d 310, 316 (1st Cir. __________ _____________ 1966). Moreover, as the government all but conceded at oral argument, it would seem that a reasonably well-trained law enforcement officer should be familiar with the fundamental legal principle that both the "commission" and "nexus" elements of "probable cause" include an essential temporal component. See ___ Leon, 468 U.S. at 920, n.20. Without necessarily endorsing their ____ sufficiency, we acknowledge that the circumstantial consider- ations relied upon by the district court, see supra note 10, are ___ _____  ____________________ made to the authorities in February 1994 that "Nelson Martell" (Zayas) had been with Brenda Koehler when she leased the McDowell garage, and the two "appear[ed] to be husband and wife"  provided some further support for a reasonable inference that Koehler and Zayas lived together at 16Holbrook Road. Id. at 9.  ___ 20 relevant to the required nexus between the date the second CI visited with Zayas at 16 Holbrook Road and the date the search warrant issued.  Fortunately for the government, other circumstantial indicia buttress the required temporal link. The analysis suggested by Zayas disregards salient inferences which well- trained, objectively reasonable law enforcement officers might draw from the totality of the circumstances disclosed in the Graffam affidavit. See Gates, 462 U.S. at 238 (requiring practi- ___ _____ cal, common-sense "probable cause" assessments by issuing magis- trates and reviewing courts). Thus, Zayas adroitly skews the focus of the Leon debate, from whether a well-trained officer ____ reasonably could have relied upon a search warrant based on the evidence described in the Graffam affidavit as well as all fair __ ____ __ ___ ____ inferences therefrom, to whether a well-trained officer would __________ _________ have known that supporting affidavits whenever practicable should provide at least approximate dates for pivotal events such as the second CI's last visit with Zayas at 16 Holbrook Road.  While Zayas would win the latter debate hands-down, he loses the former under Leon's "objectively reasonable officer" ____ test because the Graffam affidavit describes a collocation of circumstances, as well as expert law-enforcement insights, adequate to enable the recency of the critical last visit by the second CI to be fairly inferred. See United States v. Jewell, 60 ___ _____________ ______ F.3d 20, 23 (1st Cir. 1995) (citing "totality of the circumstanc- es" test, and rejecting defendant's invitation to "engage in a 21 piecemeal examination of the affidavit, and [to] base our review of the clerk-magistrate's actions on `"bits and pieces of infor- mation in isolation"'") (citation omitted). First, the Graffam affidavit afforded ample basis for finding the second CI trust- worthy.11 See supra Section II.A. Second, the link with 16 ___ _____ Holbrook Road, whether as Zayas' residence or drug operation site, plainly satisfied the "probable cause" standard. All that remained was the temporal component of the "commission" and "nexus" elements. See supra pps. 13-15.  ___ _____  ____________________ 11The affidavit would enable a reasonably well-trained police officer to conclude that the second CI was a reliable informant, based both on Graffam's vouching and on the very detail of the second CI's information about "Nelson Martell" [Zayas], particularly the earlier cocaine-related arrest in Connecticut, see supra note 7, which Graffam verified with the ___ _____ Connecticut police before the affidavit was submitted. 22 As to the "commission" element, the ongoing nature of Zayas' cocaine trafficking activities in the Manchester area was amply demonstrated in the supporting affidavit: first, by Sosa's admission that Zayas had supplied the six ounces of cocaine seized from Sosa's residence on January 26, 1994, the date of Sosa's arrest; and by the second CI, who informed the Manchester police on February 24, 1994 twelve days before the challenged search that Zayas, alias "Juan," "currently controls" cocaine distribution at various Manchester business establishments, including the Oasis Social Club. See supra Section I.A.1.  ___ _____ As to the "nexus" element, the pivotal linkage was the second CI's statement that "Juan lives" in Bedford, where on "several occasions" the second CI had visited "Juan" and seen cocaine and cash in substantial quantities. Though imprecise, these temporal references were related by the second CI in the present tense, which at the very least would permit an objective- ly reasonable officer to infer that the occurrences described were substantially contemporaneous with the second CI's inter- view, which in turn took place within twelve days of the warrant _____ __ ____ ____ _____ ______ ______ ____ __ ___ _______ application. The second CI's description of various exterior ___________ features of 16 Holbrook Road, as substantially corroborated by virtually contemporaneous aerial surveillance, likewise lent to the probability that his last visit had been relatively recent, rather than remote in time. The few minor discrepancies in the second CI's descriptive account were by no means necessarily attributable to a substantial time lapse. See Schaefer, 87 F.3d ___ ________ 23 at 567 (noting that "magistrate may reasonably choose to . . . disregard petty inconsistencies" in informants' statements). Finally, the second CI made statements that plainly imply regu- lar, ongoing transactions at 16 Holbrook Road, e.g., that "[S]panish males" arrived "every Tuesday" at the Bedford resi- _____ dence in automobiles bearing New York license plates. Absent any indication or suggestion that Graffam purposely withheld more precise temporal references adverse to the warrant application, see supra note 9, it would be pure ___ _____ speculation to credit Zayas' implicit premise that the last visit the second CI had with Zayas at 16 Holbrook Road was necessarily remote in time even though there was probable cause to believe that Zayas was still trafficking cocaine less than two weeks before the search. See, e.g., id. at 568 ("[I]t is common ground ___ ____ __ that drug conspiracies tend to be ongoing operations, rendering timely [two- or three-year-old] information that might, in other contexts, be regarded as stale."); United States v. Hernandez, 80 ______ ______ _________ F.3d 1253, 1259 (9th Cir. 1996) ("With respect to drug traffick- ing, probable cause may continue for several weeks, if not months, [from] the last reported instance of suspect activity."); United States v. Smith, 9 F.3d 1007, 1014 (2d Cir. 1993) (weeks ______ ______ _____ or months); Rivera v. United States, 928 F.2d 592, 602 (2d Cir. ______ ______ ______ 1991) (noting that in drug trafficking cases, information may be weeks or months old). Finally, it is one thing to find use of the past tense "lived" insufficient to indicate a current residence, as Zayas urges; quite another to equate "lives" with "lived." 24 See supra Section I.A.2. It is one matter to find the term ___ _____ "dealt" inadequate to indicate current drug dealing; quite another to equate "deals" with "dealt." See id.  ___ ___ To this must be added the weight due Graffam's insights into drug trafficking modi operandi, based on more than two ____ ________ decades as a DEA agent. See supra Subsections I.A.4 & I.A.5. ___ _____ Given Graffam's expertise, it would be "objectively unreasonable" to conclude, as Zayas simply presumes, that mere stoppage of __ _____ ______ ________ postal deliveries and electrical utility services, or the use, listing, and/or maintenance of other residential addresses, or nominee owners such as Brenda Koehler, compelled an inference that Zayas was no longer residing, conducting drug operations, or keeping illicit drug-related records, at 16 Holbrook Road. Thus, in no sense would it have been objectively unreasonable for a well-trained police officer to believe there was a fair probabil- ity that these developments were subterfuges prompted by Sosa's recent arrest and designed to prevent detection, as the Graffam affidavit indicated. See id. ___ ___ III III CONCLUSION CONCLUSION __________ We therefore conclude that a well-trained law enforce- ment officer reasonably could have relied upon the Graffam affidavit as adequate support for the issuing magistrate's finding that there was a fair probability that drug trafficking records would be found at 16 Holbrook Road on March 8, 1994. Accordingly, the district court judgment is affirmed.  the district court judgment is affirmed.  _______________________________________ 25