**UNITED STATES of America**

v.

**Delon J. ADAMS, Defendant**

**No. CRIM. 02–64–P–H.**

United States District Court, D. Maine.

Oct. 1, 2002.

David J. Van Dyke, Berman & Simmons, P.A., Lewiston, ME, Jeffrey W. Langholtz, Biddeford, ME, for Delon J Adams (1) aka Joseph Deleon Adams, defendant.

Richard W. Murphy, Office of the U.S. Attorney, Portland, ME, for U.S.

**ORDER AFFIRMING RECOMMENDED DECISION OF THE MAGISTRATE JUDGE**

HORNBY, Chief Judge.

The United States Magistrate Judge filed with the court on September 10, 2002, with copies to counsel, his Recommended Decision on Motion for to Suppress. The defendant filed his objection to the Recommended Decision on September 17, 2002. I have reviewed and considered the Recommended Decision, together with the entire record; I have a *de novo* determination of all matters adjudicated by the Recommended Decision; and concur with the recommendations of the United States Magistrate Judge for the reasons set forth in his Recommended Decision, and determine that no further proceeding is necessary.

It is therefore ORDERED that the Recommended Decision of the Magistrate Judge is hereby ADOPTED. The defendant's motion to suppress evidence is DENIED.

## RECOMMENDED DECISION ON MOTION TO SUPPRESS

COHEN, United States Magistrate Judge.

Delon J. Adams, charged with one count of being a felon in possession of a firearm (a Sturm Ruger 9–millimeter pistol, serial number 306–17722) in violation of 18 U.S.C. §§ 922(g)(1) and 924 and two counts of knowingly using, carrying and brandishing the same firearm in relation to a drug-trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(ii), seeks to suppress evidence seized pursuant to a search warrant issued on or about March 15, 2002 by the Maine District Court. Superceding [sic] Indictment (Docket No. 16); Motion To Suppress Firearm and Particular Fruits of Search ("Motion") (Docket No. 12); Defendant's Memorandum of Points and Authorities in Support of Motion To Suppress Firearm and Particular Fruits of Search ("Defendant's Memorandum") (Docket No. 12).[1] For the reasons discussed below, I recommend that the Motion be denied.

### I. Search Warrant Application

On March 15, 2002 Detective Philip A. Greenwood of the Biddeford Police Department sought a warrant from the Maine District Court to search "[t]he residence/apartment of Susan Whitmore, Amanda Whitmore, Delon Adams and Christopher Wright located at 61 High Street in the City of Biddeford" for, *inter alia*, "[a] black in color, semi-automatic pistol, having an attached lazer [sic] sighting unit, of either 9MM or .40 S & W

caliber," pistol ammunition of either nine-millimeter or .40 S & W caliber, police officer business cards and scheduled drugs. Affidavit and Request for Search Warrant dated March 15, 2002 ("Application"), contained within Exh. 2 to Government's Consolidated Response and Objections to Defendant's Pretrial Motions ("Opposition") (Docket No. 18), at 1.

The Application was supported by an affidavit in which Greenwood stated that he had probable cause to believe that the High Street apartment contained contraband and evidence of the crimes of armed robbery, criminal threatening with a firearm, possession of a firearm by a felon and unlawful trafficking in scheduled drugs. Affidavit in Support of Probable Cause ("Greenwood Aff."), contained within Exh. 2 to Opposition, at [2]. He based this assessment on:

1. A report by Jamie Frazier of 30 Center Street in Biddeford that Frazier had been the victim of a robbery on February 12, 2002 during his participation in the unlawful distribution of scheduled drugs. *Id.* at [3]. According to Greenwood, Frazier stated, "contrary to his own penal interest," that (i) he (Frazier) had been contacted through intermediaries by Christopher Wright concerning the purchase of marijuana, (ii) Frazier agreed to provide approximately a quarter-ounce of marijuana to Wright and to meet with Wright and an intermediary on Center Street to conduct the transaction, (iii) at approximately 8:30 p.m. Frazier walked from his residence to the area of 38 Center Street, where he met the intermediary and a black male whom he later learned was "DeLon Adams," (iv) Adams produced a black semi-automatic pistol equipped with

a laser-sighting device, which he cocked and pointed at Frazier, (v) the intermediary fled, saying he did not know it was to be a robbery, (vi) Adams threatened to shoot Frazier in the knee and punched him in the face, forcing him into a stairwell of 38 Center Street where Adams aimed the pistol at him and demanded that he empty his pockets, (vii) Adams stole approximately $60 in cash and a quarter-ounce of marijuana, then fled in the vehicle in which he had arrived with the intermediary, and (viii) Adams was a muscularly built black male approximately thirty years old and six feet tall. *Id.*

2. A post-*Miranda* statement given by Christopher Wright to Biddeford police on March 8, 2002 after Wright was arrested for operating a motor vehicle with a suspended drivers' license. *Id.* According to Greenwood, Wright (i) stated that he had information about a series of armed robberies perpetrated by his housemate Delon Adams in the Biddeford/Saco area, (ii) admitted, "against his own penal interest," that he had arranged the purchase of quantities of scheduled drugs from individuals on behalf of Adams, who planned to rob them at the time of the transaction, (iii) described five or six such incidents, including one in which he stated that he contacted Jamie Frazier, whom he mistakenly believed to have the last name of Anderson, through an intermediary and arranged the purchase of approximately twenty "beans"—dosage units of "Ecstasy" (MDMA), (iv) the intermediary picked Adams up and transported him to the prearranged meeting, (v) Wright later joined Adams on Center Street, where Adams informed him that he had just robbed Frazier at gunpoint, (vi) Adams told Wright that he had pointed the gun at Frazier and struck, pistol-whipped and injured him during the robbery and that the intermediary had fled the scene. *Id.* at [3]-[4].

3. A further statement given by Wright to Biddeford police on March 11, 2002, while Wright was released on bail, in which (per Greenwood) Wright stated that (i) Adams possessed two firearms used during commission of the robberies, (ii) he and Adams resided together at the residence of Susan Whitmore and her two daughters at 61 High Street in Biddeford, (iii) one of Adams' firearms, which Wright believed were stolen, was a black semi-automatic pistol with attached laser-sighting unit, kept by Adams in the apartment in a bedroom shared with Chrissie Whitmore (whom Adams was dating), (iv) the pistol normally was kept by Adams in the top bureau drawer or in a small safe with ammunition, (v) Wright had personally seen the pistol, which had been used in multiple robberies over the preceding months, in Adams' possession within the past twenty-four hours, (vi) Wright had personally seen Adams in possession of ammunition for the pistol, which Wright described as hollow-point bullets, and (vii) during several robberies Adams had impersonated a police officer by using business cards of police officers with whom he had come in contact on unrelated matters, and had represented himself to be those officers during fictitious "busts." *Id.* at [4]-[5].

4. An interview of Ronnie Morrell at Biddeford High School on March 7, 2002 "in connection with a related robbery incident involving Delon Adams and Christopher Wright" in which (per Greenwood) Morrell admitted, "contrary to his own penal interest," that at Wright's request he had organized the sale of approximately a half-ounce of marijuana and thirty "beans" of Ecstasy between Matthew Erichson and Delon Adams and that Adams had robbed Erichson by impersonating an undercover police officer and forcibly taking the drugs that were to be sold. *Id.* at [5]. Wright

also corroborated Morrell's description of this incident. *Id.*

5. A report to the Maine State Police on January 22, 2002 by Laurie Adams of Hollis, Maine that two handguns had been stolen from her residence. *Id.* Laurie Adams, then involved in divorce proceedings against Delon Adams, told police she believed Adams had taken the two handguns on a recent visit to her residence, after which she noticed they were missing. *Id.* She identified the two firearms as a Kel Teck .40 S & W-caliber semi-automatic pistol, serial number 54868, and a Ruger P–93DC nine-millimeter-caliber semi-automatic pistol, serial number 306–17722. *Id.*

6. Records checks, including (i) a Maine Department of Motor Vehicles check showing Delon J. Adams of 1090 Hollis Road in Hollis, Maine to be a black male born on March 22, 1972, approximately five feet eleven inches tall and weighing approximately one hundred and ninety eight pounds, (ii) a Biddeford Police Department check showing Delon J. Adams, same birthdate and Social Security number, residing at 61 High Street in Biddeford as of February 20, 2002, (iii) criminal records checks revealing that Adams had an extensive criminal history including usage of numerous alias names, dates of birth and Social Security numbers and felony convictions for fraud, assault, forgery, marijuana possession and weapons offenses in Phoenix, Arizona in 1993. *Id.*[2]

7. A Biddeford Police Department record of an incident on February 20, 2002 in which Adams was charged with leaving the scene of a motor vehicle accident involving Adams and Jonathan and Tanya Hunt. *Id.* Adams was reported to have left the scene of the accident prior to the arrival of police, informing Jonathan Hunt that he

(Adams) was "wanted." *Id.* Adams reportedly later phoned Jonathan Hunt, promised to pay for the damages and stated that he had a large amount of money coming into his possession soon. *Id.* at [5]-[6]. Adams reportedly also admitted to Jonathan Hunt that he was capable of making money easily because he "sold beans on the side." *Id.* at [6].[3]

On March 15, 2002 Judge André G. Janelle issued a warrant to search the Whitmore/Adams/Wright apartment for the items Greenwood had described. *See generally* Search Warrant dated March 15, 2002 ("Warrant"), contained within Exh. 2 to Opposition. The warrant was executed on March 18, 2002; items seized included a box of nine-millimeter "Gold Dot" ammunition and a "Ruger" handgun found inside a "strong box" and a loaded magazine and nine-millimeter round found inside the gun. Inventory dated March 21, 2002, contained within Exh. 2 to Opposition, & inventory log attached thereto at 2 (items 16–19).

## II. Discussion

In his Motion, Adams seeks suppression both of the Warrant and the contents of the lockbox—the Ruger handgun, the box of nine-millimeter "Gold Dot" ammunition, handgun magazine and nine-millimeter round of ammunition. Defendant's Memorandum at 1. He argues, in the main, that the Greenwood affidavit falls short of providing probable cause for issuance of the Warrant inasmuch as it is "conspicuously devoid" of any assessment of the credibility of Frazier, Wright and Morrell while proferring "entirely inconsistent descriptions of the Frazier incident" from Frazier and Wright. *Id.* at 3. Alternatively, he posits that the Warrant did not validly

---

2. Copies of the underlying documents were attached to and incorporated in the Greenwood affidavit by reference. *See* Greenwood Aff. at [5].

3. A copy of a police report concerning this incident was attached to and incorporated by reference in the Greenwood affidavit. *See* Greenwood Aff. at [6].

authorize search or seizure of the lockbox, Greenwood having failed to seek express authority to search or seize containers on the premises despite his foreknowledge that the Ruger pistol might be found in a "small safe." *Id.* at 3–4.[4]

The government rejoins that (i) Adams' probable-cause challenge is without merit, (ii) even if probable cause were lacking, the "good faith" exception to the exclusionary rule set forth in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), would apply, and (iii) a warrant to search premises for certain articles inherently authorizes search of containers on the premises that might contain those articles. Opposition at 9–14. I agree that the probable-cause challenge founders (as a result of which I do not reach the *Leon* argument) and that the lockbox search fell within the scope of the Warrant.

## A. Probable Cause

"Probable cause exists when the affidavit upon which a warrant is founded demonstrates in some trustworthy fashion the likelihood that an offense has been committed and that there is sound reason to believe that a particular search will turn up evidence of it." *United States v. Schaefer*, 87 F.3d 562, 565 (1st Cir.1996) (citation and internal quotation marks omitted). Both the issuing magistrate and a subsequent reviewing court look to "the totality of the circumstances indicated in a supporting affidavit" to assess the existence *vel non* of probable cause. *Id.; see also, e.g., United States v. Vega–Figueroa*, 234 F.3d 744, 755 (1st Cir.2000) ("We review the question of probable cause de novo, assessing the information provided in the four corners of the affidavit supporting the warrant application[.]") (citation and inter-

nal quotation marks omitted). "Yet such review cannot start from scratch. A magistrate's determination of probable cause should be paid great deference by reviewing courts." *Schaefer*, 87 F.3d at 565 (citation and internal quotation marks omitted).

An affiant need not necessarily assess (or otherwise vouch for) the credibility of informants to demonstrate probable cause for issuance of a warrant. *See, e.g., id.* at 566 ("[A]n informant's tales need not invariably be buttressed by extensive encomia to his veracity or detailed discussions of the source of his knowledge. While an informant's truthfulness and basis of knowledge are highly relevant in determining the value of his report, the [Supreme] Court has cautioned that these elements should [not] be understood as entirely separate and independent requirements to be rigidly exacted in every case.") (citation and internal quotation marks omitted).

Informants' credibility can be established in multiple ways, including:

1. Consistency among independent reports. *See, e.g., id.* ("Courts often have held that consistency between the reports of two independent informants helps to validate both accounts.").

2. Declarations against penal interest. *See, e.g., id.* ("The fact that an informant's statements are against his or her penal interest adds credibility to the informant's report.").

3. Consistency with information provided by "ordinary citizens" (such as complaints by neighbors that an individual was cultivating marijuana)—a type of report that enjoys "special stature since information provided by ordinary citizens has par-

---

4. "The general federal rule on who bears the burden of proof with respect to an allegedly illegal search or seizure is based upon the warrant-no warrant dichotomy: If the search or seizure was effected pursuant to a warrant, the defendant bears the burden of proving its illegality; if the police acted without a warrant, the prosecution bears the burden of establishing legality." *United States v. Long-mire*, 761 F.2d 411, 417 (7th Cir.1985).

ticular value in the probable cause equation." *Id.*

4. Corroboration by external data. *See, e.g., id.* at 567 ("The record contains several external data (i) confirming the identities and predilections of Crawford, Spellman, and other growers in the group, (ii) pinning down Crawford's and Spellman's involvement with cannabis cultivation, and (iii) demonstrating the group's access to marijuana plants that were being grown indoors.") (footnote omitted).

5. Self-authentication "through the very specificity and detail with which [an affidavit] relates the informant's first-hand description of the place to be searched[.]" *United States v. Zayas–Diaz*, 95 F.3d 105, 111 (1st Cir.1996).

All of these forms of corroboration are present in the Greenwood affidavit:

█ 1. Although there are discrepancies between the Frazier and Wright reports of the Frazier robbery, such as the drug involved (marijuana versus Ecstasy) and the manner in which Adams injured Frazier (punching in the face versus pistol-whipping and striking), these independent reports are on the whole remarkably consistent. In addition, the Morrell statement independently corroborates Wright's disclosure that one of Adams' *modus operandi* in robbing drug dealers was impersonation of police officers.

2. As Greenwood took pains to point out in his affidavit, Frazier, Wright and Morrell all made declarations against their own penal interest, revealing their involvement in the serious crimes of drug trafficking and, in Wright's case, aiding and abetting armed robbery.

3. A statement by an ordinary citizen—Jonathan Hunt—corroborated that Adams made money from criminal endeavors (he was "wanted" by the police and "sold beans on the side").

4. Independent data buttressed the likelihood that Adams possessed firearms and was dealing on some level with illicit drugs. This data included a criminal-history check revealing that Adams had been convicted for marijuana possession and weapons offenses (among other crimes), and a January 2002 report to police by Adams' estranged wife, Laurie, that two handguns (including a Ruger) had been stolen from her and that she believed Adams to have been the perpetrator.

5. Wright, who was Adams' roommate, described the nature and location of Adams' firearms and ammunition in detail based on fresh first-hand observation.

In summary, given these multiple indicia of the general reliability of the Frazier, Wright and Morrell reports, Judge Janelle properly found probable cause to believe that Adams had committed crimes (including armed robbery) and that the fruits and instrumentalities of those offenses (including firearms and drugs) would be uncovered upon a search of the apartment Adams shared with Wright.

### B. Scope of Warrant

Adams' final argument—that the search of the lockbox exceeded the scope of the Warrant appears to rest on the proposition that, to the extent a law-enforcement officer has reason to believe contraband may be found within a container, he must seek express authority to search containers within a premises. Defendant's Memorandum at 3–4. He cites no authority for this proposition, which (as the government points out) does not comport with clearly established law. *See* Opposition at 13–14.

█ A warrant to search a premises inherently confers authority to search containers or other closed spaces within the described premises that might harbor the items sought to be seized. *See, e.g., United States v. Ross*, 456 U.S. 798, 820–821,

102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) ("A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search. Thus, a warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found.") (footnote omitted); *United States v. Hamie*, 165 F.3d 80, 83 (1st Cir.1999) ("[A]ny container situated within a residential premises which are the subject of a validly-issued warrant may be searched if it is reasonable to believe that the container could conceal items of the kind portrayed in the warrant.") (citation and internal quotation marks omitted). Thus, regardless whether an officer has foreknowledge that particular contraband likely will be found within a specific container, there is no reason to seek express authority to search containers within a premises in which the items sought might be found.

### III. Conclusion

For the foregoing reasons, I recommend that the defendant's motion to suppress evidence be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Sept. 10, 2002.