# United States Court of Appeals
## For the First Circuit

No. 24-1070

UNITED STATES OF AMERICA,

Appellant,

v.

CARLOS GONZALEZ,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark G. Mastroianni, U.S. District Judge]

Before

Gelpí and Rikelman, Circuit Judges,
and Katzmann,[*] Judge.

Donald C. Lockhart, Assistant United States Attorney, with whom Joshua S. Levy, Acting United States Attorney, was on brief, for appellant.

Linda J. Thompson, with whom James R. Goodhines, Goodhines Law Offices, and Thompson & Thompson, P.C. were on brief, for appellee.

August 26, 2024

---

[*] Of the United States Court of International Trade, sitting by designation.

**RIKELMAN**, <u>Circuit Judge</u>.  After the government searched the house where Carlos Gonzalez lived for evidence of an illegal pill-making operation, Gonzalez moved to suppress the evidence found during the search.  The district court granted his motion, concluding that the critical facts supporting the search warrant application were too "stale" and that the affidavit was otherwise so bare bones that no reasonable officer could have relied on the warrant.  The court pointed out that according to the affidavit, the mastermind of the pill-making operation had moved out of that same house four and a half months earlier, there was little (if any) suspicious activity at the house after his move, and the pill-making equipment was highly portable.

The government appeals, arguing that the facts in the affidavit were enough to justify a finding of probable cause, and, in any event, they were not so conclusory that a reasonable officer could not rely on the warrant.  Thus, the government asks us to reverse the district court's ruling suppressing the evidence from the search.

We agree with the government.  Although we elect to bypass the district court's probable-cause determination, which we view as a close call, we find that a reasonable officer could have relied on the warrant in good faith.  As the government argues, based on the facts in the affidavit, a reasonable officer could have concluded that the leader of the pill-making operation had

-2-

every reason to keep the operation where it had been successful for years -- the house where Gonzalez continued to live. Thus, we vacate the district court's ruling on the motion to suppress and remand for further proceedings.

## I. BACKGROUND

Before diving into the details of the lengthy search warrant affidavit, we summarize the key facts. On January 20, 2022, Drug Enforcement Administration (DEA) Special Agent Scott Smith applied for a warrant to search a three-story, two-family house at 8 Mereline Avenue in East Longmeadow, Massachusetts. In his affidavit supporting the warrant application, he described the DEA's four-year investigation into a pill-making operation that distributed counterfeit oxycodone pills containing fentanyl and heroin. According to Smith, the operation ran out of two locations: the 8 Mereline Avenue house, owned by Michael Matos and his wife Neysha, and an auto-repair shop in nearby Agawam, owned by Hector Ramos.

Smith went on to describe how Michael Matos oversaw the production of the counterfeit pills in the basement of 8 Mereline Avenue. According to Smith, Matos used tableting machines and binding agents to process heroin and fentanyl into pills. To make the pills resemble oxycodone tablets, Matos used dyes and imprinted the pills with letters and numbers that typically signify certain dosages of oxycodone. Smith explained that Gonzalez and Matos

then supplied the fentanyl and heroin pills to Ramos, who stored the pills and sold them from his auto-repair shop.

Critically for this case, Matos and his wife lived on the second floor of 8 Mereline Avenue until September 2021, when they moved to a new home about fifteen minutes away in Somers, Connecticut. The Matos family continued to own 8 Mereline Avenue and visit the house after they relocated, and no one else moved into the second-floor unit. Meanwhile, Gonzalez, who had lived on the first floor of 8 Mereline Avenue since at least June 2020, continued to reside in the house with his girlfriend Kiara Rodriguez-Santiago, including on the date of the search in late January 2022.

In his warrant application to the magistrate judge, Smith sought to search both 8 Mereline Avenue and Ramos's auto-body shop. He stated that there was probable cause to believe that both locations were being used in connection with a drug operation and that drugs, paraphernalia for processing and distributing drugs, and cash proceeds would be found in both places.

DEA agents executed the search warrant for 8 Mereline Avenue on January 25, 2022. They seized, among other things, 5,000-6,000 counterfeit oxycodone pills containing fentanyl, two firearms, two magazines with several rounds of ammunition, and equipment and supplies for making counterfeit pills. This

equipment included pill-press parts, dye molds for stamping pills, and counterfeit oxycodone labels.

With this factual overview in place, we proceed to discuss the details of the DEA investigation as described in Smith's affidavit, citing "only those facts necessary to put the probable-cause [and good-faith] issue into workable perspective." United States v. Rivera, 825 F.3d 59, 61 (1st Cir. 2016).

## A. The DEA Investigation

Federal agents began to investigate Matos's pill-making operation in early 2018, four years before the warrant was issued, when pills containing heroin were discovered inside a toolbox repossessed from Matos. Those pills were marked with "M" on one side and "30" on the other -- the same markings used by an FDA-registered drug manufacturer for its thirty milligram oxycodone tablets. A few months later, officers with the East Longmeadow Police Department, who were helping with the federal investigation, conducted two traffic stops near "the area" of 8 Mereline Avenue. During the first stop, officers recovered counterfeit oxycodone tablets. During the second stop, an officer discovered about twelve grams of heroin in the possession of a driver who had links to Matos.

Smith's affidavit in support of the search warrant features accounts from two confidential informants (CIs), including one who saw Matos's operation in action in the basement

of 8 Mereline Avenue. The two CIs cooperated with law enforcement after they were arrested on April 5, 2021, in connection with a separate fentanyl-pill-processing operation in Springfield, Massachusetts. One of the informants (CI-2) explained that, in early 2020, he and his partner (CI-1) learned that a person named "Mikey" was making a significant profit from manufacturing and selling counterfeit oxycodone tablets -- an operation that they decided to replicate. CI-2 first met Mikey at Ramos's auto-repair shop, where Mikey brought out a tableting machine and showed CI-2 how it worked. CI-2 stated that Mikey carried the tableting machine in a large suitcase wrapped in a comforter and that he had a second suitcase that contained "all of the other processing equipment." CI-2 then explained how he met with Mikey three times at Mikey's residence. Each time he went to Mikey's residence, CI-2 brought ten to twenty grams of heroin, which Mikey would mix and process into counterfeit oxycodone tablets using a pill-press machine in the basement, charging CI-2 between eight and nine dollars per pill. Using a map on an agent's cell phone, CI-2 showed agents that Mikey's residence was on Mereline Avenue. According to CI-2, the last time he met with Mikey on Mereline Avenue was in April or May of 2020, about one year and nine months before the search warrant here was issued.

CI-1 corroborated CI-2's account. He told agents that he and CI-2 had been manufacturing counterfeit oxycodone tablets

for about one year -- so, since around April 2020.  He explained that they learned how to make fake pills on the internet and with the help of a person named Mikey, who met with CI-2, owned a BMW and a Tesla, and lived "in the area of" the Friendly's Restaurant in East Longmeadow.  To put CI-1's information in context, Smith explained in his affidavit that 8 Mereline Avenue is located about 0.3 miles from the Friendly's Restaurant in East Longmeadow and that Neysha Matos owns a 2014 BMW and a 2015 Tesla.  Based on the accounts of CI-1 and CI-2, Smith believed that "Mikey" referred to Michael Matos and that the residence where CI-2 observed a pill-making operation was 8 Mereline Avenue.

In addition to detailing the accounts by CI-1 and CI-2, Smith described how pill-making equipment was ordered or sent to 8 Mereline Avenue in 2020 and 2021.  In December 2020, Customs and Border Patrol officers seized a pill-press machine that was en route to Neysha Matos at 8 Mereline Avenue.  In February 2021, Kiara Rodriguez-Santiago ordered a pill-press punch set to be shipped to 8 Mereline Avenue, and in May 2021, Gonzalez ordered two pill-press punch sets to be shipped there.

Importantly for our purposes, Matos and his wife purchased a new home in Somers, Connecticut in July 2021.  And on September 6, 2021, about four and a half months before the search warrant was issued, they moved from 8 Mereline Avenue into this new home.

-7-

Agents continued to surveil 8 Mereline Avenue after Matos and his wife moved out, but the activity they saw at the house in the next several months was much more limited, especially after mid-September. On September 13, 2021, agents observed Matos and Gonzalez leave the home in a blue pickup truck registered to Gonzalez and drive to Ramos's shop. There, Matos and Gonzalez met with Ramos and went inside his office. About fifteen minutes later, Gonzalez and an unidentified man wearing a fanny pack across his chest drove back to 8 Mereline Avenue in a truck registered to Neysha Matos. Three days later, on September 16, Gonzalez and three others drove from Ramos's shop to a Walmart in Westfield, Massachusetts, where Gonzalez paid about $460 in cash for items that Smith stated were commonly used to process narcotics. Gonzalez and the others then drove to a home on Norman Street in Springfield, Massachusetts, at which point the truck backed into the driveway, close to an open garage door, and everyone exited. Three minutes later, they all got back into the truck and drove to 8 Mereline Avenue.

After these two events in mid-September 2021, Smith's affidavit documents less frequent activity at 8 Mereline Avenue. Much of the activity that is described is not obviously related to illegal pill making. Smith relayed that in November 2021, about two and a half months before the search warrant was issued, Matos spent about six hours at 8 Mereline Avenue. Matos then left the

house with another individual, who was never identified, each carrying an Amazon box. About forty minutes after Matos left, a car drove up and parked in front of 8 Mereline Avenue. That car was registered at the same address provided by the driver who was stopped by the police near the house in 2018 with heroin in his car. An unidentified man got out of the car and walked down the driveway, though the affidavit contains no other details about the visit. Then, on January 6, 2022, agents observed Matos drive a pickup truck registered to Gonzalez to a hardware store and return to 8 Mereline Avenue. Although Smith obtained a copy of Matos's receipt, the affidavit does not specify what Matos bought at the store. Also on January 6 (and at other times over the "several weeks" preceding the search), agents saw a Tesla parked on the street; that car was purchased by Matos and another person who lived on 49 Norman Street in Springfield -- the home where Gonzalez had stopped after he purchased alleged drug-processing supplies in September. But again, Smith did not describe in his affidavit any interactions between the occupants of the Tesla and anyone at 8 Mereline Avenue.

Finally, Smith discussed controlled purchases that another confidential informant (CI-3) made at Ramos's shop throughout the investigation. The purchase closest in time to the search warrant application occurred during the week of December 6, 2021, when CI-3 purchased counterfeit oxycodone pills stamped with

"M" on one side and "30" on the other -- like the pills found in the toolbox repossessed from Matos in 2018.

Smith concluded his affidavit with information about Michael and Neysha Matos's bank accounts. According to Smith, the account records revealed large cash deposits throughout 2020 and 2021 -- money that could not be traced to a legitimate source of income.

## B. Gonzalez's Indictment and Motion to Suppress

After the search and seizure of pills and firearms from 8 Mereline Avenue on January 25, 2022, a grand jury indicted Gonzalez on (1) one count of possession with intent to distribute 400 grams or more of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(vi), and (2) one count of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A).

Gonzalez then moved to suppress the evidence seized during the search. He argued that Smith's affidavit relied on stale information and failed to show a sufficient nexus between 8 Mereline Avenue and evidence of drug activity.

The district court granted Gonzalez's motion to suppress. In a detailed opinion, it held that the affidavit did not demonstrate probable cause to believe that evidence of an illegal pill-making operation would be found at 8 Mereline Avenue in late January 2022. United States v. Gonzalez, No. 22-30027,

-10-

2023 WL 8789287, at *6 (D. Mass. Dec. 18, 2023).  The court determined that "[a]lthough the affidavit provided some connection between the residence and suspected criminal activity in 2020 and mid-2021, this information was too stale by the time the government applied for the search warrant."  Id.

The district court found no probable cause for three main reasons.  First, it focused on the Matos family's move from Mereline Avenue to Connecticut in September 2021.  Id.  The court acknowledged that the affidavit "intricately and amply link[ed] Michael and Neysha Matos to 8 Mereline Avenue and suspicious activity indicative of an illegal drug operation," but it determined that the events creating that link occurred before the move.  Id.  The court found that this time gap, combined with the move, was "critical and . . . fatal to the probable cause determination."  Id.  In its view, the affidavit lacked facts suggesting that evidence of pill making would still be kept at 8 Mereline Avenue in late January 2022, months after the move and years after CI-2 saw the operation in action in the basement.  Id.  Second, the court explained that the affidavit indicated that the pill-press punches and tableting machines were highly portable.  Id.  According to CI-2, Matos could transport the tableting machine and the other processing equipment in two suitcases.  Id.  Third, the court noted that the affidavit identified other places where Matos easily could have relocated the pill-making equipment:

-11-

Ramos's auto-body shop and his new Connecticut home. Id. at *7. The court further determined that the events recounted in the affidavit that occurred in the four and a half months before the search -- such as Gonzalez's trip to Walmart in September 2021 and Matos's visit to Mereline Avenue in January 2022 -- did not revive the out-of-date information or establish a tangible link between the drug operation and 8 Mereline Avenue. Id. at *7-9.

Although deeming it a "much closer question," the district court also concluded that the good-faith exception set out in United States v. Leon, 468 U.S. 897 (1984), could not save the search. Id. at *9. In its view, "the affidavit represent[ed] the type of 'bare bones' or conclusory showing which does not satisfy the good[-]faith exception" because "the connection between 8 Mereline Avenue and any recent criminal activity was extremely thin, bordering on non-existent." Id. (quoting Leon, 468 U.S. at 915, 926). Because staleness is a fundamental defect, the court explained, an objectively reasonable officer would have realized that the affidavit failed to establish probable cause. Id. at *9-10. It thus held that suppression of the evidence was the appropriate remedy. Id. at *10.

The government's timely appeal followed.

## II. STANDARD OF REVIEW

We review de novo the district court's legal conclusion about whether a given set of facts amounts to probable cause.

-12-

United States v. Perez Soto, 80 F.4th 50, 59 (1st Cir. 2023).
Similarly, we review de novo the applicability of the Leon good-faith exception. United States v. Cordero-Rosario, 786 F.3d 64, 72 (1st Cir. 2015).

### III. DISCUSSION

The government argues that the district court legally erred in concluding that the facts in Smith's affidavit were stale and thus could not support a finding of probable cause. It also contends that even if the affidavit failed to establish probable cause, it was not so bare bones or conclusory that no objectively reasonable officer could have relied on the search warrant. For that reason, the government urges us to exercise our discretion to bypass the probable-cause issue and reverse on the ground that the officers' conduct in this case is covered by the Leon good-faith exception.

We agree with the government that we can bypass the probable-cause finding and proceed straight to the Leon good-faith issue here. Thus, we assume arguendo that the affidavit failed to establish probable cause that evidence of the pill-making operation would be found at 8 Mereline Avenue in late January 2022. And we focus our analysis instead on "consideration of the officers' good faith." Leon, 468 U.S. at 925 (recognizing the appropriateness of such an approach in some cases and reversing based on application of the good-faith test, without disturbing

-13-

the district court's finding of no probable cause); see also United States v. Robinson, 359 F.3d 66, 69 (1st Cir. 2004) (declining to decide whether warrant was supported by probable cause and instead affirming on the ground that affiant acted in objective good faith in applying for warrant); United States v. Beckett, 321 F.3d 26, 32-33 & n.4 (1st Cir. 2003) (taking same approach); United States v. Owens, 167 F.3d 739, 744-45 (1st Cir. 1999) (recognizing that, under Leon, "courts have discretion to consider the issue of officers' good faith without first addressing Fourth Amendment issues" and assuming in defendant's favor that probable cause did not support search before turning to good faith).

Before diving into the Leon analysis, however, we briefly address a threshold issue. Gonzalez claims that the government waived its probable-cause-bypass argument because it did not mention this possible approach to the district court. But the government argued to the district court, as it does on appeal, that the good-faith exception applies and the evidence need not be suppressed, even if the affidavit lacked probable cause. And its argument that we can reverse on good-faith grounds is one it could make only on appeal. So, there was no waiver by the government here.

We turn now to the good-faith analysis. Ultimately, we conclude that the Leon good-faith exception applies. We part ways with the district court's careful opinion because we conclude that

it was objectively reasonable for an officer to believe that Matos's pill-making operation was still underway at its longstanding home base in early 2022.  We reach this conclusion based on several key facts in the affidavit: Matos still owned 8 Mereline Avenue and continued to live nearby and visit; the remaining occupants of 8 Mereline Avenue were Gonzalez and his girlfriend, who also appeared to be involved in the operation; and the pill-making operation had operated successfully from 8 Mereline Avenue for years, and thus, an objectively reasonable officer could have concluded that Matos had little reason to move it.

## A. The Probable-Cause Standard

To explain why an objectively reasonable officer could have believed that probable cause supported the warrant, we lay out the relevant standard.  "An application for a warrant must demonstrate probable cause to believe that (1) a crime has been committed -- the 'commission' element, and (2) enumerated evidence of the offense will be found at the place searched -- the so-called 'nexus' element."  United States v. Roman, 942 F.3d 43, 50 (1st Cir. 2019) (quoting United States v. Dixon, 787 F.3d 55, 59 (1st Cir. 2015)).  As to the nexus element, the magistrate judge must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit[,] . . . there is a fair probability that contraband or evidence of a crime will be found

in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983); see also Rivera, 825 F.3d at 63 (explaining that "'fair probability' is another way of saying 'reasonable likelihood'"). Fair probability is less than a more-likely-than not standard. United States v. Feliz, 182 F.3d 82, 88 (1st Cir. 1999).

Importantly, the "commission" and "nexus" elements of the probable-cause inquiry "each include a temporal component." United States v. Zayas-Diaz, 95 F.3d 105, 113 (1st Cir. 1996). Thus, the magistrate judge must "consider the accuracy and reliability of the historical facts related in the affidavits." Id. But the magistrate judge also must determine "whether the totality of the circumstances reasonably inferable from the affidavit[]" establishes a fair probability that evidence of the crime will be found in the place to be searched "at about the time the search warrant would issue, rather than at some remote time." Id. Information in an affidavit is stale if it "establishe[s] probable cause at some point in the past but does not support probable cause at the time of the warrant's issuance." United States v. McLellan, 792 F.3d 200, 210 (1st Cir. 2015).

Under the exclusionary rule, when a magistrate judge issues a warrant that is not supported by probable cause, the evidence obtained from the search is usually suppressed. United States v. Sheehan, 70 F.4th 36, 51 (1st Cir. 2023). That is, unless the Leon good-faith exception applies.

-16-

## B. The Good-Faith Exception to the Exclusionary Rule

Suppression of evidence from an illegal search is "inappropriate . . . if the officer who conducted the search acted in reliance upon the defective warrant and that reliance was objectively reasonable." Id. This rule is known as the "good-faith exception." Id. It is based on the principle that, "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." Herring v. United States, 555 U.S. 135, 144 (2009). As the Supreme Court has explained, "[w]hen the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." Davis v. United States, 564 U.S. 229, 238 (2011) (quoting Herring, 555 U.S. at 144). On the other hand, "when the police act with an objectively reasonable good-faith belief that their conduct is lawful . . . or when their conduct involves only simple, isolated negligence[,] . . . the deterrence rationale loses much of its force, and exclusion cannot pay its way." Id. (internal quotation marks and citations omitted).

The government bears the "heavy burden" of showing that its officers acted with objective good faith. United States v. Wurie, 728 F.3d 1, 13 (1st Cir. 2013). In assessing whether the

-17-

government has met this burden, "we evaluate all of the attendant circumstances at the time of the warrant application and its execution." United States v. Brunette, 256 F.3d 14, 17 (1st Cir. 2001).

With this background in place, we turn to Smith's search warrant affidavit.

### 1. Was Smith's Affidavit Conclusory or Bare Bones?

We start with the issue on which the parties focus most of their attention: whether the affidavit here was "so lacking in indicia of probable cause" that an officer's belief that probable cause existed was "entirely unreasonable." Leon, 468 U.S. at 923 (citation omitted); see also United States v. Capozzi, 347 F.3d 327, 334 (1st Cir. 2003) (explaining that a "bare bones affidavit" on which it is objectively unreasonable for an officer to rely is one that "provide[s] the magistrate [judge] with only the suspicions and conclusions of the officer" without underlying factual information in support). The government argues that an objectively reasonable officer could have believed the search warrant was valid because, even accounting for Matos's move, the affidavit contained detailed information linking the pill-making operation to 8 Mereline Avenue about four and a half months before the search. According to the government, given the long-running nature of the operation and the lack of facts suggesting that Matos had moved it to his new Connecticut home, it was logical for an

-18-

officer to believe that there was a fair probability evidence of pill making would still be found at Mereline Avenue as of late January 2022. Gonzalez, by contrast, contends that Matos's move to a new residence, together with the passage of four and a half months with no significant criminal activity at 8 Mereline Avenue, were "obvious and fatal" to probable cause, such that no reasonable officer could have relied on the warrant.

We hold that the government has met its burden to demonstrate that the good-faith exception applies. See Beckett, 321 F.3d at 32 (recognizing that an affidavit could be insufficient for the purpose of probable cause but sufficient for an officer to rely on in objective good faith). We reach this conclusion for two main reasons. First, a reasonable officer could infer from facts in the affidavit that Matos had little incentive to move his successful, ongoing operation from Mereline Avenue to his new family home in Connecticut. Second, the staleness issue in this case is at least a close call, and, as such, we cannot say that it would be objectively unreasonable for an officer to rely on this warrant after it was approved by the magistrate judge. Thus, the affidavit was not so bare bones or conclusory such that it fails under Leon.

As the district court found, and the parties do not appear to dispute, ample facts suggested an illegal drug operation at 8 Mereline Avenue from 2020 until mid-2021, before the Matos

-19-

family moved. For example, CI-2 stated that he learned how to produce counterfeit oxycodone pills in part through visits to "Mikey's" residence on Mereline Avenue, with the most recent visit in April or May of 2020. There, he watched "Mikey" mix and process the heroin CI-2 brought into counterfeit oxycodone tablets using a pill-press machine and dyes in the basement, charging CI-2 for each pill produced. Along with relaying CI-2's eyewitness account of the operation at work, the affidavit stated that one pill-press punch set was shipped to Rodriguez-Santiago at 8 Mereline Avenue in February 2021, and two pill-press punch sets were shipped to Gonzalez there in May 2021.

The district court concluded, however, that these facts were stale by early 2022. It found that no probable cause existed to search 8 Mereline Avenue in late January 2022 because Matos had moved out of the house, there was very little (if any) suspicious activity at the location after his move, and the pill-making equipment was highly portable. Gonzalez, 2023 WL 8789287, at *7. And we agree with the district court that, after mid-September and until the government applied for the search warrant in January, the affidavit shows a drop-off in activity indicative of a drug operation at 8 Mereline Avenue. As the court observed, the affidavit contains fewer facts identifying 8 Mereline Avenue as a probable hub for a pill-making operation after the move compared to 2020 through mid-2021.

But the government persuasively argues that the magistrate judge was required to evaluate the facts in a common-sense manner. And reviewing the affidavit's facts through that lens, a reasonable officer could have concluded that the warrant was valid because it was unlikely that the head of a drug operation would move it to his new family home, instead of keeping it at its existing location where it had functioned for years without detection (as far as Matos seemingly knew). See Zayas-Diaz, 95 F.3d at 114 (examining the inferences an officer could draw from the totality of circumstances in the affidavit to determine whether, at the time the warrant was issued, an objectively reasonable officer would believe that the defendant's residence was still serving as the site of his drug operations).

Five key facts in the affidavit made it reasonable for an officer to believe that Matos had every incentive to keep his drug operation in its long-standing location. First, the Matos family continued to own the house on Mereline Avenue after they moved to their new home, only about fifteen minutes away. See United States v. Schaefer, 87 F.3d 562, 568 (1st Cir. 1996) (explaining that "[t]he target's ownership of the real estate to be searched influences the staleness calculus"). Second, 8 Mereline Avenue is located close to Ramos's shop, the other operational hub identified in the affidavit. Third, Matos continued to spend time at Mereline Avenue up until the month of

the search, and it did not appear that anyone moved into the second floor of the house after he and his wife moved out. Fourth, Gonzalez and Rodriguez-Santiago were connected to the drug enterprise, and they still lived at 8 Mereline Avenue when the warrant was issued. Smith's affidavit described Gonzalez's involvement in the pill-making operation in 2021, including his purchase of pill-press punch sets in May to be sent to Mereline Avenue, his multiple trips to Ramos's shop, and his September trip from Ramos's shop to Walmart to buy alleged drug-processing supplies. Smith also stated that pill-making equipment under Rodriguez-Santiago's name was shipped to Mereline Avenue in late February 2021.

Finally, the affidavit described an ongoing, successful drug operation that was active one month before the search. See United States v. Encarnacion, 26 F.4th 490, 498 (1st Cir. 2022) (explaining that the timeliness of probable cause varies "with the nature of the suspected offense"); United States v. Nocella, 849 F.2d 33, 40 (1st Cir. 1988) (recognizing that drug conspiracies are ongoing operations that "[b]y [their] very nature [and] if unchecked, [are] apt to persist over relatively long periods of time").[1] For example, in December 2021, CI-3 went to Ramos's shop

---

[1] The existence of circuit precedent on this probable cause-related issue is relevant to our assessment of whether it was reasonable for an officer to believe that the warrant was

-22-

and purchased counterfeit oxycodone pills that had the same markings as those found in Matos's toolbox that was repossessed from him in 2018, when he was living at Mereline Avenue. And bank records for the Matos family showed hundreds of thousands of dollars in cash deposits in 2020 and 2021 that could not be traced to a legitimate source of income.

From the totality of these facts, a reasonable officer could have believed that Matos would have chosen to keep his operation at 8 Mereline Avenue, where it had been prosperous for many years, and that there was a fair probability that evidence of pill making would be found there at the time of the search. See United States v. Bucuvalas, 970 F.2d 937, 940 (1st Cir. 1992), abrogated on other grounds by Cleveland v. United States, 531 U.S. 12 (2000) (crediting the "net 'common sense' import of the information" in an affidavit when determining whether the place to be searched was a "secure operational base" where evidence would be stored); Beckett, 321 F.3d at 32 (agreeing with the district court that facts showing a nexus between evidence of criminal activity and the defendant's home were "less than overwhelming" but finding that inferences about where the defendant would store

lawfully issued. See United States v. Grupee, 682 F.3d 143, 148 (1st Cir. 2012) ("With [United States v. Meyer, 536 F.2d 963, 966 (1st Cir. 1976)] on the books and the account of the evidence found in the house, the Task Force officers acted in what the preceding discussion shows was objectively reasonable reliance on the search warrant." (cleaned up)).

items of enduring utility were objectively reasonable). Thus, a reasonable officer could have relied on the warrant. See Zayas-Diaz, 95 F.3d at 116; see also United States v. Floyd, 740 F.3d 22, 33-34 (1st Cir. 2014) (explaining that the probable-cause inquiry does not involve "merely counting the number of days elapsed" between events described in the affidavit and the warrant's issuance, but, rather, "[e]verything depends on context" (internal quotation marks and citations omitted)).

The fact that, as the district court observed, Matos's pill-making equipment was portable did not render an officer's reliance on the warrant objectively unreasonable. Even if the equipment itself could be moved, it was still reasonable to believe that Matos had little incentive to set up a new hub for the conspiracy.

At the very least, the key facts amount to "evidence sufficient to create disagreement among thoughtful and competent judges as to the existence of probable cause." Leon, 468 U.S. at 926; see United States v. Ricciardelli, 998 F.2d 8, 15 (1st Cir. 1993), abrogated on other grounds by United States v. Grubbs, 547 U.S. 90 (2006) (explaining that exclusion of evidence is inappropriate in cases involving "borderline calls about the existence of probable cause"); United States v. Scroggins, 361 F.3d 1075, 1084 (8th Cir. 2004) (stating that the exclusionary rule's deterrent purpose is not served when "the police take a

close call to a judge before searching"). In such circumstances, we cannot say that no reasonable officer could have relied on the warrant.

Having determined that a reasonable officer could have believed that the affidavit established probable cause for the search, we turn to two additional arguments Gonzalez makes as to why the good-faith exception should not apply.

## 2. Did the Magistrate Judge Wholly Abandon Her Judicial Role?

Gonzalez suggests that the good-faith exception does not apply for a separate reason -- the magistrate judge "wholly abandoned [her] judicial role." See Leon, 468 U.S. at 923. We determine, however, that Gonzalez has failed to support this contention.

Gonzalez notes that the warrant application and sixty-four-page affidavit were filed on January 20, 2022, and the magistrate judge issued the warrant at 9:30 am that same day. From this timeline, he asserts that "the record . . . raises the specter that the magistrate [judge] might not have thoroughly considered Smith's affidavit" and instead served as a "rubber stamp for the police." See Leon, 468 U.S. at 914-15.

The government points out that it is standard practice for the affidavit and warrant to have the same date, and Gonzalez offers no information to undermine the government's account. As the government explains, it typically submits a search warrant

-25-

affidavit to the magistrate judge in advance, at which point the judge may ask the government to address areas of concern. Then, assuming the magistrate judge approves the warrant, final versions of the warrant application, affidavit, and warrant are filed on the docket with identical dates.[2] Therefore, the government maintains, the fact that the affidavit and warrant have the same date does not indicate how much time the magistrate judge may have spent reviewing the affidavit. We also note that Gonzalez's contention overlooks the fact that the magistrate judge issued a search warrant for 8 Mereline Avenue on December 10, 2021, but when that warrant was not executed within fourteen days, Smith filed another affidavit -- the one at issue here. That affidavit was largely identical to the first; the only difference was that it contained about three additional pages describing the surveillance of Mereline Avenue in January 2022. Thus, the fact that the affidavit and warrant bear the same date is not enough to suggest that no reasonable officer could rely on the warrant.

### 3. **Franks** Issues

Gonzalez also contends that the good-faith exception should not apply because of "lurking Franks problems," but this

---

[2] We further note that the process of obtaining a search warrant involves an ex parte proceeding in which the government asks the magistrate judge to find probable cause to conduct a search. See Fed. R. Crim. P. 41(d). The record does not suggest any judicial impropriety in that process.

issue is one for the district court to consider in the first instance. Before the district court, Gonzalez moved to continue the suppression hearing so that he could file a motion for a hearing under Franks v. Delaware, 438 U.S. 154 (1978).[3] The district court denied his request but informed Gonzalez that, if it ruled in the government's favor on the suppression motion, "the door is still open for there to be a supplement, if there's a showing for a Franks issue to be raised." The court then evaluated the suppression motion -- considering whether the four corners of the affidavit set forth probable cause and whether a reasonable officer could have relied on the warrant -- while "making clear that [Gonzalez was] not waiving [his] right to file a Franks hearing or a request" later, if his pursuit of the potential Franks issue he identified was fruitful.

Now, following our review of the suppression ruling, we conclude that the affidavit was not so devoid of indicia of probable cause that no reasonable officer could have relied on it, and that the record does not suggest the magistrate judge wholly abandoned her judicial role. In so concluding, we do not pass on

_____

[3] Under Franks, a defendant is entitled to an evidentiary hearing to challenge the truthfulness of statements in a search warrant affidavit if the defendant makes a substantial preliminary showing that: (1) the affidavit contains an intentional or reckless false statement or omission, and (2) the false statement or omission was necessary to the finding of probable cause. United States v. O'Neal, 17 F.4th 236, 244 (1st Cir. 2021) (citing Franks, 438 U.S. at 156).

any potential argument by Gonzalez that, under <u>Franks</u>, the warrant is nevertheless invalid and the evidence should be suppressed because the affidavit contains intentional or reckless material misrepresentations or omissions. See <u>Leon</u>, 468 U.S. at 923 (explaining that the good-faith exception does not apply when the affiant misleads the magistrate judge with information that violates <u>Franks</u>); <u>United States</u> v. <u>Vigeant</u>, 176 F.3d 565, 572-75 (1st Cir. 1999) (concluding that the government failed to show objective good faith and that excluding evidence would have a substantial deterrent effect on the police because the affidavit made material omissions and included false and misleading statements). And because we now vacate the district court's suppression order and remand for further proceedings, Gonzalez can make such an argument and challenge statements in the affidavit on remand.

## IV. CONCLUSION

For all these reasons, we **<u>vacate</u>** the district court's order granting Gonzalez's suppression motion and **<u>remand</u>** for further proceedings consistent with this opinion.

-28-